UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED 3/30/18

STRUCTURE TONE, INC.,

                    Petitioner,

   -v-

NEW YORK CITY DISTRICT COUNCIL OF
CARPENTERS PENSION FUND & DAVID
STEWART,

                    Respondents.

No. 17-cv-2917 (RJS)
OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge:

Now before the Court is Petitioner Structure Tone's motion to vacate an arbitration award (the "Award") entered in favor of Respondent the New York City District Council of Carpenters Pension Fund (the "Fund"). (Doc. No. 21.) For the reasons set forth below, the motion is DENIED.

I. BACKGROUND

A. STATUTORY SCHEME

This dispute concerns the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, which regulates private pension funds and, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), contains specific provisions relating to multiemployer pension plans. *See* 29 U.S.C. §§ 1002(37)(A), 1381–1453. As indicated by its title, a multiemployer pension plan is a pension plan to which multiple employers contribute pursuant to one or more collective bargaining agreements. *See id.* § 1002(37)(A). In order to ensure that an employer's exit from a multiemployer plan does not undermine the plan's finances and place an undue burden on the employers remaining in the plan, the MPPAA created a regime

of withdrawal liability. Specifically, if an employer withdraws from a multiemployer plan, that employer is assessed "withdrawal liability," calculated to equal that employer's portion of the plan's unfunded pension benefits. *See id.* §§ 1381, 1391.

At issue here is whether Petitioner "withdrew" from the Fund. Generally, a withdrawal occurs "when an employer (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).[1] However, while that provision applies to most employers, Congress created a special withdrawal scheme for employers engaged in the "building and construction industry." That provision, commonly referred to as the "construction industry exemption," effectively imposes withdrawal liability on employers in the building and construction industry only if:

(A) an employer ceases to have an obligation to contribute under the plan, and

(B) the employer –

(i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or

(ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

29 U.S.C. § 1383(b)(2).

The MPPAA provides that when an employer withdraws from a multiemployer plan, the pension fund serving as the plan sponsor is responsible for determining the amount of withdrawal liability owed and collecting it. *See id.* § 1382. If the employer disagrees with the plan sponsor's assessment, the employer must first submit the dispute to arbitration. *See id.* § 1401. After

---

[1] Although the statute distinguishes between "complete" and "partial" withdrawals, that distinction is not at issue here. *See* 29 U.S.C. § 1385(a) (defining partial withdrawals).

arbitration, a party can bring an action in district court to enforce, vacate, or modify the arbitration award. *See id.* §§ 1401, 1451.

## B. FACTUAL BACKGROUND

Petitioner is a New York corporation involved in the construction industry as a general contractor and construction management firm.[2] (Pet. ¶ 3; Pet. Decl., Ex. J at 3.) The Fund is a multiemployer pension benefit plan as defined by ERISA, *see* 29 U.S.C. §§ 1002(3), 1002(37)(A), and Respondent David Stewart is the Executive Director of the Fund and a fiduciary within the meaning of ERISA, *see id.* § 1002(21)(A).

Prior to June 30, 2015, Petitioner was party to a collective bargaining agreement (the "CBA") between the Building Contractors Association, Inc. and the District Council of New York City and Vicinity of the Brotherhood of Carpenters and Joiners of America, AFL-CIO (the "Union"). (*See* Pet. Decl., Ex. C ("CBA").) The CBA required Petitioner to make contributions to the Fund for all work performed by its employees in certain enumerated categories of construction work ("Covered Work") within the geographical territory of the CBA, which included the five boroughs of New York City and a portion of suburban Long Island. (*See id.*, arts. III, IX, XVI.) Although the CBA did not require Petitioner to make contributions on behalf of the employees of any subcontractors that it hired, the CBA nevertheless contained a subcontracting clause, which provided that "[a]ll work covered by this Agreement shall be contracted or subcontracted only to an Employer who is signatory to or agrees to become signatory to a collective bargaining agreement with the Union." (*Id.* at 62.)

---

[2] The facts are drawn from the Petition (Doc. No. 5 ("Pet.")), Respondents' Response (Doc. No. 13 ("Resp.")), Petitioner's memorandum of law in support of its motion (Doc. No. 22 ("Mem.")), the Declaration of Aaron C. Schlesinger in support of the motion (Doc. No. 23 ("Pet. Decl.")), Respondents' memorandum of law in opposition to the motion (Doc. No. 24 ("Opp'n")), the Declaration of Marc A. Tenenbaum in opposition to the motion (Doc. No. 25 ("Resp. Decl.")), and Petitioner's reply memorandum of law (Doc. No. 26 ("Reply")).

The CBA expired on June 30, 2015, and Petitioner effectively terminated the agreement on that date. (Pet. ¶ 10.) Petitioner admits that it continues to operate as a general contractor in the jurisdiction of the CBA, but emphasizes that it does so exclusively through subcontractors. (Pet. ¶¶ 11, 12.) Some of these subcontractors are signatories to the CBA, but others are non-signatory subcontractors. (*Id.* ¶ 12.) On August 18, 2015, a Fund representative wrote to Petitioner, stating that the Fund had determined that Petitioner had completely withdrawn from the pension plan and that Petitioner was subject to withdrawal liability totaling $1,089,049. (*See* Pet. Decl., Ex. D.) In response, Petitioner requested that the Fund review its withdrawal liability determination, arguing that Petitioner was not subject to withdrawal liability under the construction industry exemption. (*See id.*, Ex. E.) When the Fund declined to revisit its assessment (*see id.*, Ex. F), Petitioner filed for arbitration.

On March 24, 2017, the arbitrator, Martin F. Scheinman (the "Arbitrator"), issued the Award, concluding in relevant part that the Fund had appropriately assessed withdrawal liability against Petitioner (*see id.*, Ex. J ("Award") at 42) and ordering Petitioner to pay $1,089,049 (*id.* at 4). Petitioner timely filed for review of the Award in this Court on April 21, 2017. (Doc. No. 1.) Petitioner's motion to vacate the Award was filed on July 14, 2017, and the motion was fully briefed by August 11, 2017. (Doc. Nos. 21–26.)

## II. LEGAL STANDARD

The MPPAA authorizes district courts "to enforce, vacate, or modify" an arbitration award. 29 U.S.C. § 1401. In a dispute regarding withdrawal liability, the Court reviews an arbitrator's conclusions of law *de novo*, *see HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158, 160 (2d Cir. 2012), while the arbitrator's findings of fact are reviewed with "a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct[,]" 29 U.S.C. § 1401(c). Here, the facts are not in dispute and the sole

4

issue before the Court involves the interpretation of the construction industry exemption. Accordingly, the Court reviews this question of statutory interpretation *de novo*.

## III. DISCUSSION

The range of disagreement in this case is narrow, since the parties agree that the outcome turns on whether or not Petitioner's behavior constituted a withdrawal under the construction industry exemption. Moreover, there is no dispute that Subsection (A) of the statutory test has been satisfied – Petitioner has indeed "ceased to have an obligation to contribute" to the Fund. 29 U.S.C. § 1383(b)(2)(A). Nor do the parties argue that Subsection (B)(ii) applies. Accordingly, the only provision at issue here is Subsection (B)(i), which allows the Fund to assess withdrawal liability if Petitioner "[1] continues to perform work [2] in the jurisdiction of the collective bargaining agreement [3] of the type for which contributions were previously required." *Id.* § 1383(b)(2)(B)(i).

Petitioner does not expressly argue that it is no longer performing work in the jurisdiction of the CBA. Rather, Petitioner merely maintains that it "has not directly performed work covered by the collective bargaining agreement." (Mem. at 3.) Accordingly, the Court assumes, as the parties appear to, that the Arbitrator correctly decided that "execution of the subcontracted work is reasonably viewed as performance by the general contractor" because "the subcontracted work was undertaken in furtherance of the Employer's performance obligation, owed to the project owner or developer as the case may be, to complete the work as a general contractor." (Pet. Decl., Ex. J at 30.)

Nevertheless, the parties *do* dispute what it means for work to be "of the type for which contributions were previously required." Specifically, Petitioner contends that "there is no withdrawal because the employer would not have been obligated to make contributions for work performed by subcontractors under the terminated agreement[.]" (Mem. at 10.) But this is simply

5

incorrect – for two reasons. First, although it is true that under the terminated agreement Petitioner would not have been obligated to make contributions for work performed by subcontractors *who were signatories to the CBA*, that is certainly not true with respect to non-signatory subcontractors. As noted above, the CBA is quite clear that "[a]ll work covered by this Agreement shall be contracted or subcontracted only to an Employer who is signatory to or agrees to become signatory to a collective bargaining agreement with the Union." (CBA at 62.) The CBA further provides that a "[c]ontractor shall contract or subcontract [Covered Work] only to firms which observe the standards of wages and fringe benefits and working conditions established herein to insure the observance of the wages, benefits, hours, and other items and conditions of employment provided herein." (*Id.*) The logical inference is that the CBA did not require general contractors to make contributions on behalf of its subcontractors' employees because it assumed that the subcontractor would make those contributions.[3] The equally logical inference is that any general contractor bold enough to employ a non-signatory subcontractor would be in breach of the CBA and obligated to pay contributions, and penalties, associated with that improper employment. (*See id.* at 51–56, 64.) Indeed, the CBA expressly required that employers "not subcontract any work covered under this Agreement to any one in order to circumvent the payment of wages, fringe benefits, and working conditions provided herein." (*Id.* at 27.) Accordingly, the Court concludes that, contrary

---

[3] Petitioner emphasizes that the CBA only requires that work under the agreement be subcontracted to an employer who is signatory to *a* collective bargaining agreement with the Union, and not "the exact same collective bargaining agreement at issue." (Mem. at 19.) However, this is a distinction without a difference. Even if Petitioner hired a subcontractor that was a signatory to a different collective bargaining agreement with the same Union, that subcontractor would be required to contribute pension payments on behalf of their employees under that collective bargaining agreement, since the CBA required subcontractors to "observe the standards of wages and *fringe benefits . . . established herein*[.]" (CBA at 62 (emphasis added).) Petitioner attempts to evade this logic by arguing, hypothetically, that a general contractor could conceivably hire a subcontractor who is a signatory to a *different* collective bargaining agreement with the Union that requires its signatories to contribute pension payments directly to individual workers rather than to the Fund, or even to a different fund. (*See* Mem. at 20). The Court rejects this strained reading of the CBA and notes, with the Arbitrator, that "there is not a scintilla of evidence that this ever happened with respect to the work in question." (Pet. Decl., Ex. J at 34.)

to its assertions, Petitioner *would* have been obligated to make contributions for work performed by non-signatory subcontractors under the CBA.

But even if it could be argued that Petitioner is right about the obligations of employers under the CBA, Petitioner would still be subject to withdrawal liability for the simple reason that Petitioner misconstrues the language of Section 1383(b)(2). Specifically, Petitioner argues that work is "of the type for which contributions were previously required" if "the employer would . . . have been obligated to make contributions for [that] work under the terminated agreement." (Mem. at 10.) But the language of Subsection B(i) is not so narrow, and does not turn on *who* was obligated to make contributions under the terminated plan; it merely requires that the work be of the type that *required* contributions. This word choice is telling, and distinct from the language of Subsection A, which immediately precedes it. That provision speaks to the employer's prior "obligation[s] to contribute under the plan." 29 U.S.C. § 1383(b)(2)(A). Logic suggests that if Congress had intended "work of the type for which contributions were previously required" to mean "work of the type for which" the employer previously "ha[d] an obligation to contribute under the plan," it would have said so and simply duplicated the language found in Subsection A. It did not, and the clear inference to be drawn from that distinction is that the language of Subsection B(i) was intended to be broader, capturing work for which contributions were previously required of *anyone* – whether subcontractors or employers directly.

In short, based on the text of Section 1383(b)(2), the Court has little difficulty concluding that Petitioner's use of non-signatory subcontractors constitutes performance of "work in the jurisdiction . . . of the type for which contributions were previously required" by the CBA.

In addition to advancing what the Court believes to be the most natural reading of the statute (and the CBA), this conclusion finds support from available tools of statutory interpretation.

In particular, the law is clear that "under longstanding principles of statutory construction, [a remedial act] should be given a liberal interpretation . . . and exemptions from its sweep should be narrowed and limited to effect the remedy intended." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 381 (1977) (internal quotations omitted). In accordance with this principle, the Court construes the construction industry exemption narrowly, with an eye towards effecting the remedial purpose of ERISA and the MPPAA, which are designed "to ensure that employees and their beneficiaries [are not] deprived of anticipated benefits from their private retirement pension plans." *T.I.M.E.-DC, Inc. v. Mgmt.-Labor Welfare & Pension Funds, of Local 1730 Int'l Longshoremen's Ass'n*, 756 F.2d 939, 943 (2d Cir. 1985). This method of interpretation is particularly appropriate in the context of the construction industry exemption given that, at the time of the passage of the MPPAA, "[m]ore than half [of the multiemployer pension plans in the United States], covering almost 30 percent of all such participants, [were] in the construction industry." H.R. Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 51 (1980) ("House Report"), reprinted in 1980 U.S. Code Cong. & Ad. News 2918, 2921.

As the Second Circuit has explained, the MPPAA "was enacted by Congress in September 1980 for the primary purpose of protecting retirees and workers who are participants in multiemployer plans against the loss of their pensions." *ILGWU Nat. Ret. Fund v. Levy Bros. Frocks*, 846 F.2d 879, 880 (2d Cir. 1985) (internal quotations omitted) (quoting House Report at 2919). Specifically, given the "serious defects in [ERISA before the MPPAA] which undermine[d] the benefit security of multiemployer plan participants[,] . . . [Congress wanted] to protect the interests of participants and beneficiaries in financially distressed multiemployer plans and to encourage the growth and maintenance of multiemployer plans." *Id*. Congress therefore created, among other things, a statutory scheme of withdrawal liability "to relieve the funding

burden on the remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers." *Id*. It was in this context that Congress enacted the construction industry exemption.

The House Report cited by the Second Circuit in *ILGWU* clearly and succinctly discusses Congress's reasoning for enacting the construction industry exemption. According to the House Report:

> In the construction industry, the funding base of the plan is the construction projects in the area covered by the collective bargaining agreements through which the plan is maintained. An individual employee will typically work for tens or even hundreds of different employers over his or her working career, and the volume of work for a given employer will often fluctuate greatly from year to year. *These normal events do not pose an undue threat to a plan as long as contributions are made for whatever work is done in the area. Therefore, the construction industry exception is designed to impose liability only on former contributors that continue to work within the plan's area.* It exempts from liability employers that cease contributions because they have no work in the area; *there is no liability when a company goes out of business, is sold, or is simply without work for a time.* Also, under this exception, an employer who comes into an area to do one project and then leaves would not be subject to liability. . . .

House Report at 2943–44 (emphasis added). *See also Multiemployer Pension Plan Amendments Act of 1979: Hearing on S. 1076 Before the S. Comm. on Labor and Human Res.*, 96th Cong. 140 (1980) (statement of Matthew Lind, Executive Director, Pension Benefit Guaranty Corp.) ("But the point is really only to attach withdrawal liability to an employer when that employer is taking work out of the jurisdiction of the plan. He continues to work in the area, using nonunion labor for example[;] that is what hurts the plan.").

In this case, as discussed above, before the CBA expired, Petitioner could only use its own employees or signatory subcontractors to perform work covered by the CBA, thus ensuring the funding base of the multiemployer plan in the area covered by the CBA. Under Petitioner's interpretation of the statute, however, Petitioner would be free to continue working as a general

contractor in the geographical jurisdiction of the CBA and to use non-union labor without being assessed withdrawal liability simply by using the very subcontractors it was barred from using under the CBA. This is precisely the scenario that Congress sought to avoid – a withdrawal undermining the funding base of the plan and causing the burden of pension payments to fall disproportionately upon the employers remaining in the plan. Obviously, this is contrary to the purpose of both the statute and the construction industry exemption. In fact, the House Report explicitly contemplates that the exemption will "impose liability . . . on former contributors that continue to work within the plan's area." *Id.*

Petitioner nevertheless argues that its interpretation – which essentially amounts to an end-run around withdrawal liability for general contractors willing to hire nonunion subcontractors – has been endorsed by the Pension Benefit Guaranty Corporation ("PBGC") in two opinion letters issued in the 1980s.[4] In the first letter, the PBGC wrote that a general contractor's employment of a subcontractor will be deemed work "of the type for which contributions were previously required" "only if the general contractor would have been obligated to contribute under the terms of its old contract for work performed by subcontractors; *i.e.*, if the old contract were still in force, the general contractor would be liable for contributions based on the subcontractor's work." Pension Benefit Guar. Corp., Opinion Letter 84-8 (Dec. 27, 1984), 1984 WL 23351, at *1 ("1984 Letter"). Similarly, in the second letter, the PBGC concluded that an employer who contracted with subcontractors after terminating a collective bargaining agreement would not incur withdrawal liability as long as it had no prior obligation under the collective bargaining agreement

---

[4] The PBGC is the wholly owned U.S. government corporation responsible for administering the MPPAA's withdrawal liability provisions. *See* 29 U.S.C. § 1302; *Trs. of Local 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 134–35 (2d Cir. 2012).

to make pension fund contributions for similarly retained subcontractors. *See* Pension Benefit Guar. Corp., Opinion Letter 85-5 (Jan. 30, 1985), 1985 WL 32705, at \*1 ("1985 Letter").

Petitioner argues that these letters are entitled to substantial deference under the doctrine enumerated in *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, as interpreted by the Supreme Court in *United States v. Mead Corp.* 533 U.S. 218 (2001), a Court should defer to an agency's interpretation of a statute where "Congress delegated authority to the agency generally to make rules carrying the force of law, and . . . the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27. The first factor of the *Mead* test is satisfied here: Congress delegated rulemaking authority to the PBGC in the MPPAA. *See, e.g.*, 29 U.S.C. § 1383(f). However, for the reasons discussed below, the Court determines that the opinion letters were not promulgated in the exercise of the PBGC's rulemaking authority.

While the Supreme Court has given conflicting indications as to the proper weight accorded to agency opinion letters, *compare Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (stating that "[i]nterpretations such as those in opinion letters . . . lack the force of law" and "do not warrant *Chevron*-style deference"), *with NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 218, 254–58 (1995) (holding, in an opinion later cited favorably by the Supreme Court in *Mead*, that an opinion letter was due *Chevron* deference), "[m]ost agency interpretations that have qualified for *Chevron* deference are rules that have been promulgated in 'regulations issued through notice and comment or adjudication, or in another format authorized by Congress for use in issuing legislative rules,'" *Estate of Landers v. Leavitt*, 545 F.3d 98, 106 (2d Cir. 2008) (quoting *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002)). In fact, as the Second Circuit has noted, the more "[r]ecent Supreme Court cases emphasize that [opinion letters] do not

deserve broad deference[.]" *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 490 (2d Cir. 2001) (holding that *Chevron* deference was not applicable to "several policy statements made in opinion letters and reports to Congress" by the EPA because "the EPA's position [was not] adopted in a rulemaking or other formal proceeding[.]"); *see also Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 643 (2013) (citing *Christensen* for the proposition that opinion letters are "not regulations with the force of law"); *Hill v. Delaware N. Companies Sportservice, Inc.*, 838 F.3d 281, 290 (2d. Cir. 2016) (citing *Christensen* for the proposition that "opinion letters . . . do not warrant *Chevron*-style deference.").

Here, the opinion letters themselves imply that the interpretations contained therein are not intended to carry the force of law. Specifically, the letters make clear that the pension fund sponsor is responsible for making the preliminary withdrawal determination, and that any dispute must be submitted to an arbitrator pursuant to the statutory dispute resolution process, indicating that the agency did not anticipate having the final word. *See* 1985 Letter, 1985 WL 32705, at *1; 1984 Letter, 1984 WL 23351, at *1. And in 1987, the PBGC issued an opinion letter explicitly addressing the issue of how much deference a court should give to PBGC opinion letters. *See* Pension Benefit Guar. Corp., Opinion Letter 87-7 (July 21, 1987), 1987 WL 68408, at *1. According to that letter, PBGC opinion letters "are not intended to dispose of particular controversies between private parties. Moreover, because they are the PBGC's interpretations of [provisions of ERISA] and not substantive rules promulgated in accordance with the notice and comment requirements of the Administrative Procedure Act, they are not binding on the public or on the courts." *Id.* The letter ultimately concludes that the proper level of deference due to PBGC opinion letters is the level of deference set out in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See id.* Under *Skidmore*, the weight accorded an administrative interpretation "will depend upon

the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Mead Corp.*, 533 U.S. at 228 (quoting *Skidmore*, 323 U.S at 140).

Accordingly, the Court concludes that the PBGC opinion letters should be given "respect according to [their] persuasiveness" pursuant to *Skidmore*. *Mead Corp.*, 533 U.S. at 221. Here, for the reasons discussed above, the Court is not convinced by the reasoning of the PBGC in its opinion letters, which is both cursory and completely conclusory, because the PBGC reaches an outcome that is at odds with the most natural reading of the text of the statute, as well as the overall purpose of the MPPAA and the construction industry exemption. Accordingly, the Court holds that since Petitioner (1) performed work (2) in the territorial jurisdiction of the CBA (3) of the type for which contributions were previously required, the Fund properly assessed Petitioner withdrawal liability and the Arbitrator properly issued the Award.

## IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Petitioner's motion to vacate the Award, and its corresponding request for fees, costs, and expenses, is DENIED. The Clerk of Court is respectfully directed to terminate the motion pending at docket number 21 and to close this case.

SO ORDERED.

Dated:  March 30, 2018
        New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE